IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES AND SHIRLEY WAYBRIGHT, \*
as personal representatives and
co-executors of the estate of \*
ANDREW WAYBRIGHT, *et al.*,
 \*
  Plaintiffs,
 \*
  v.      Civil Action No.: RDB 05-55
 \*
FREDERICK COUNTY MARYLAND
DEPARTMENT OF FIRE & RESCUE \*
SERVICES, *et al.*,
 \*
  Defendants.
 \*

\* \* \* \* \* \* \* \* \* \* \* \* \*

<u>MEMORANDUM OPINION</u>

This action arises out of a Complaint originally filed in the Circuit Court for Frederick

County, Maryland.  The estate of Andrew Waybright and James and Shirley Waybright, as

personal representatives and co-executors of the estate of Andrew Waybright (collectively,

"Plaintiffs") brought this action against Jeffrey Coombe, Walter Murray, Stanley Poole, Mark

McNeal, Andrew Marsh, David Gray, John L. Thompson, Jr., Richard Welden, Jan H. Gardner,

Terre R. Rhoderick, and the Frederick County, Maryland Department of Fire and Rescue

Services, an agency of Frederick County, Maryland (collectively, "Defendants").[1]  The case was

removed to this Court based on federal question jurisdiction arising from allegations of

violations of the United States Constitution.  The Complaint seeks damages in connection with

---

[1] Defendants fall into three categories: (1) individuals who worked for the
Frederick County, Maryland Department of Fire and Rescue Services, *i.e.*, Jeffrey Coombe,
Walter Murray, Stanley Poole, Mark McNeal, and Andrew Marsh; (2) members of the Board of
Commissioners for Frederick County, Maryland, *i.e.*, Commissioners David Gray, John L.
Thompson, Jr., Richard Welden, Jan H. Gardner, and Terre R. Rhoderick; and (3) the municipal
defendant, Frederick County, Maryland.

the tragic and untimely death of firefighter recruit Andrew Waybright on July 3, 2002.  Mr.

Waybright died from heat exhaustion suffered in connection with physical training exercises

administered by Defendant Jeffrey Coombe of the Frederick County, Maryland Department of

Fire and Rescue Services.  Currently pending before this Court are two Motions for Summary

Judgment, one filed by Defendant Jeffrey Coombe and the other filed by the remaining

Defendants.  This Court has jurisdiction under 28 U.S.C. § 1331.  The issues have been fully

briefed and a hearing was conducted on February 17, 2007.  For the reasons that follow,

Defendants' Motions for Summary Judgment are GRANTED-IN-PART and DENIED-IN-

PART.  As result, judgment will be entered in favor of Defendants and against Plaintiffs with

respect to the Plaintiffs' federal and state constitutional claims under 42 U.S.C. § 1983 and

Article 24 of the Maryland Declaration of Rights.  Plaintiffs' residual claims based on Maryland

tort law, however, will be REMANDED to the Circuit Court for Frederick County, Maryland.

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

This Court reviews the facts of this case in the light most favorable to the party opposing

the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On July 3, 2002, at 6:30 a.m., 23 year-old firefighter recruit Andrew Waybright reported

for a physical fitness training session at the Frederick County Public Safety Training Center (the

"Training Center").  At 7:00 a.m., the one-hour training session began.  It involved a short walk,

a 3-4 mile run, calisthenics, uphill wind sprints, and a jog.  Toward the end of the exercises,

Waybright looked "sick, dehydrated, pale, and in a state of exhaustion and pain."  (Pl.'s Opp.

Mots. Summ. J. Ex. 1 (the "Board of Inquiry Report") p. 20.)  At the time, the temperature was

approximately 84.2 degrees Fahrenheit and the humidity was 84 percent, resulting in a heat

index of 96.

Just before 8:10 a.m., Waybright collapsed.  Two civilians saw Waybright lying face-down in the grass and offered to call 911.  A firefighter attending to Waybright, however, told them that assistance was not necessary and that Waybright was "just played out."  (Board of Inquiry Report p. 28.)  At some point, the paramedics were called and arrived on the scene.  At 8:16 a.m., a paramedic reported that Waybright had gone into cardiac arrest.  (*Id*. at p. 8.)  At 8:32 a.m., Waybright was transported to the emergency room of Frederick Memorial Hospital.  At 9:22 a.m., a doctor pronounced Andrew Waybright dead.  His core body temperature was 107.4 degrees Fahrenheit.  An autopsy identified hyperthermia as the cause of death and indicated that Waybright "had no preexisting conditions. . . ."  (*Id*.)

Defendant Jeffrey Coombe was the physical training instructor for the session on July 3, 2002.  It is undisputed that Coombe failed to recognize Waybright's deteriorating condition during the training exercise.  After Waybright collapsed, Coombe stayed with Waybright for a short period of time.  Without administering basic first aid, Coombe left Waybright to return to the Training Center and assigned a firefighter named Eckhardt to attend to Waybright.  After arriving at the Training Center, Coombe asked another firefighter—Troy Grossnickle—to get a pick-up truck and help Waybright.  After driving to Waybright in the pick-up truck, Grossnickle was advised by Eckhardt that "Waybright was unconscious and to call for an ambulance." (Board of Inquiry Report p. 21.)  Grossnickle returned to the Training Center to get a "bag valve mask" and oxygen but could not find the equipment.  (*Id*. at 8.)  Grossnickle told yet another firefighter to call 911 and then drove to Waybright with some other firefighters.  "As they arrived, FfR Waybright went into cardiac arrest, and the paramedic member of the [Combat Challenge Team] initiated CPR."

It is further undisputed that Coombe was not a trained physical fitness instructor.

Coombe testified that he did "nothing" to become an instructor.  (Coombe Dep., p. 23, l. 3.)  At least one member of the Frederick County, Maryland Department of Fire and Rescue Services (the "Department") indicated that Coombe was not a "Level II" instructor, as required by the Maryland Fire and Rescue Institute.  (Himes Dep. p. 29, ll. 3-15.)  A Board of Inquiry was empaneled and its report noted that:

> The Department placed the physical training instructor in a position with supervisory responsibilities for which he was not prepared.  The instructor had not yet completed training to obtain certification in physical fitness.

(Board of Inquiry Report p. 17.)  Coombe apparently completed a 36-hour shift just before beginning the recruit training class on July 3, 2002.

Although medical equipment was available at the Training Center, nobody retrieved it to help Waybright because the location of the equipment was unknown.  As already noted, firefighter Grossnickle could not find a bag valve mask or oxygen when he went to the Training Center to get help for Waybright.  As Coombe explained to the Board of Commissioners for Frederick County, Maryland (the "Board"), "there was no [medical] equipment, no one knew where it was[, i]f it was there, it was locked up."  (Pl.'s Opp. Mots. Summ. J. Ex. 3 p. 26.)  There were also no radios or other communication devices with the recruit class during the training session on July 3, 2002.  Coombe explained that this equipment was "under lock and key in the offices at the training center."  (*Id.* at p. 24.)

Coombe's supervisors were aware of at least some of the above problems.  For example, Defendant Stanley Poole acknowledges that training sessions such as the one that took place on July 3, 2002, should have been led by at least two instructors and involved a "gator" vehicle equipped with water, supplies, and communications equipment.  (*See* Poole Dep. p. 142, ll. 4-12.)  Other Defendants indicated that Poole had expressed concerns about the scheduling of

4

instructors for Waybright's recruit class.  (*See*, *e.g.*, Marsh Dep. p. 137, ll. 8-17; *see also* Poole

Dep. p. 147, ll. 14-16 (Acknowledging "the shortage of staff and the ability to have instructors

available and those kind of things.").)  The Board of Inquiry Report concluded that "[t]he

Department lack[ed] the supervisory staff to operate a recruit school safely and effectively at the

[Training Center] at this time."  (Board of Inquiry Report p. 18.)

On March 9, 2004, Plaintiffs filed a Complaint in the Circuit Court for Frederick County,

Maryland.  (Paper No. 2.)  This pleading asserted causes of action for wrongful death, loss of

solatium, and survival under Maryland state law.  (*Id*.)  Each cause of action was premised on

allegations of negligence.[2]  (*Id*.)  On July 14, 2004, Defendants filed a Motion for Summary

Judgment.  (Paper No. 13; *see also* Paper No. 2 Ex. 1 p. 5.)  On November 17, 2004, Judge Julie

R. Stevenson Solt of the Circuit Court for Frederick County conducted a hearing.  (*Id*. at p. 6.)

During that hearing, Judge Solt granted Defendants' Motion for Summary Judgment with respect

to the survival actions.[3]  (Def.'s Mem. Supp. Summ. J. Ex. 16.)

---

[2]       For example, with respect to Defendant Jeffrey Coombe, Plaintiffs alleged:

That as a direct and proximate result of the negligence of
Defendant, Jeffrey Coombe, the Plaintiffs jointly lost, and will
continue to lose the society, companionship, comfort, protection,
care, attention, advice, counsel, training, education, or guidance of
the Decedent, Andrew Waybright.

(*Id*. at ¶ 34.)

[3]       The official transcript of the November 17 hearing provides:

THE COURT:       First of all I do note that the plaintiffs did
agree as to the survival actions that
summary judgment is appropriate.  Those
are clearly derivative actions [and] would
have been barred.  And it is, and, Counsel, I
do trust you to correct me if I am wrong.  I
believe that applies to count one, count four,

On December 10, 2004, Plaintiffs filed a First Amended Complaint.  (Paper No. 26.)

This pleading asserted new causes of action under 42 U.S.C. § 1983 and Article 24 of the

Maryland Declaration of Rights.  (*Id.*)  Theses causes of action were premised on the contention

that Waybright's substantive due process rights were violated.  (*Id.*)  On January 7, 2005,

Defendants removed this action from the Circuit Court for Frederick County to this Court.

(Paper No. 1 (notice of removal); *see id.* at ¶ 7 ("Because Plaintiffs' First Amended Complaint

asserts claims arising under the Constitution and laws of the United States, Plaintiffs' action may

be removed to this Court on the grounds of federal question jurisdiction. . . .").)

On January 4, 2006, this Court granted Plaintiffs' request for leave to file a Second

Amended Complaint.  (Paper No. 58.)  This pleading reflected various amendments "to tailor the

already existing civil rights claim to what was learned in discovery over the last several months."

(Paper No. 57.)  On May 1, 2006, Defendant Coombe filed his Motion for Summary Judgment.

(Paper No. 68.)  On the same day, the other Defendants filed their Motion for Summary

Judgment.  (Paper No. 69.)  On August 21, 2006, Defendant Richard Himes was voluntarily

dismissed.  (Paper No. 90.)  On September 5, 2006, John Does 1-20 were also dismissed.  (Paper

No. 94.)  On February 17, 2007, this Court conducted a hearing on Defendants' Motions for

---

| | |
|---|---|
| | count seven, and count ten.  Just take a second, because I want to make sure that is correct<br>. . . |
| PLAINTIFFS'<br>COUNSEL: | That's correct. . . . |
| THE COURT: | Defendant's motion for summary judgment is granted on the survival actions: count one, count four, count seven, and count ten. |

(Def.'s Mem. Supp. Summ. J. Ex. 16 pp. 40-41.)

Summary Judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita*, 475 U.S. at 587 (1986) (quoting *United States v. Diebold*, Inc., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, under certain circumstances the opponent must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25 (1986).  "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)).

## DISCUSSION

## I.      The Complaint.

Plaintiffs' Second Amended Complaint contains 329 paragraphs and 47 counts.  It is summarized in the following chart:

| Defendant | Causes of Action (Count) |
|---|---|
| **Walter Murray**, officer of Frederick County, Maryland Department of Fire and Rescue Services (the "Department") | Survival Action (1); Wrongful Death (2); Loss of Solatium (3); 42 U.S.C. § 1983 (27); Article 24 of the MD Decl. of Rights (28). |
| **Jeffrey Coombe**, member of the Department | Survival Action (4); Wrongful Death (5); Loss of Solatium (6); 42 U.S.C. § 1983 (23); Article 24 of the MD Decl. of Rights (24). |
| **Stanley Poole**,  member of the Department | Survival Action (7); Wrongful Death (8); Loss of Solatium (9); 42 U.S.C. § 1983 (25); Article 24 of the MD Decl. of Rights (26). |
| **Mark McNeal**, officer of the Department | Survival Action (10); Wrongful Death (11); Loss of Solatium (12); 42 U.S.C. § 1983 (31); Article 24 of the MD Decl. of Rights (32). |
| **Andrew Marsh**, officer of the Department | Survival Action (13); Wrongful Death (14); Loss of Solatium (15); 42 U.S.C. § 1983 (29); Article 24 of the MD Decl. of Rights (30). |
| **David Gray,** member of the Board of Commissioners for Frederick County, Maryland (the "Board") | 42 U.S.C. § 1983 (35); Article 24 of the MD Decl. of Rights (36). |
| **John L. Thompson, Jr.**, member of the Board | 42 U.S.C. § 1983 (37); Article 24 of the MD Decl. of Rights (38). |
| **Richard Welden**, member of the Board | 42 U.S.C. § 1983 (39); Article 24 of the MD Decl. of Rights (40). |
| **Jan H. Gardner**, member of the Board | 42 U.S.C. § 1983 (41); Article 24 of the MD Decl. of Rights (42). |
| **Terre R. Rhoderick**, member of the Board | 42 U.S.C. § 1983 (43); Article 24 of the MD Decl. of Rights (44). |
| **Frederick County** | *respondeat superior* (22); 42 U.S.C. § 1983 (47). |

Count 46, which asserts claims of "supervisory liability" against the "supervisory officers as alleged herein," is not reflected in the above chart.  (Sec. Am. Compl. ¶ 317.)  In addition, the causes of action against Defendants Richard Himes (Counts 16-18 and 33-34) and John Does 1-

20 (Counts 19-21 and 45) are also not summarized above as those Defendants were dismissed. (*See* Paper Nos. 90 & 94.)

Plaintiffs contend that Andrew Waybright's substantive due process rights to "life, bodily integrity, medical care, freedom from arbitrary injurious governmental conduct, and freedom from deliberately indifferent conscious shocking behavior" were violated by Defendant Jeffrey Coombe on July 3, 2002. (Pl.'s Opp. Mots. Summ. J. p. 35.) The rights at issue are guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution [4] and Article 24 of the Maryland Declaration of Rights.[5] Waybright's Fourteenth Amendment rights, moreover, are secured by 42 U.S.C. § 1983, which provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.[6]

## II.    Qualified Immunity.

---

[4]    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

[5]    Article 24 of the Maryland Declaration of Rights provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Declaration of Rights, Art. 24.

[6]    42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Coombe asserts the defense of qualified immunity with respect to Plaintiffs' federal

constitutional claims.  Under that doctrine, "government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  As the United States Court of

Appeals for the Fourth Circuit recently emphasized, any qualified immunity analysis involves

two steps:

> First, we must determine, "[t]aken in the light most favorable to
> the party asserting the injury, do the facts alleged show the
> officer's conduct violated a constitutional right?"  *Saucier v. Katz*,
> 533 U.S. 194, 201 (2001).  Only if the answer is "yes" do we
> advance to "the next, sequential step," which is "to ask whether the
> right asserted was clearly established" at the time of the events at
> issue.  *Id*.  We conduct this latter inquiry by determining whether a
> reasonable officer would have understood that his conduct violated
> the asserted right.  *Id*. at 202.  "[T]he answer to both *Saucier*
> questions must be in the affirmative in order for a plaintiff to
> defeat a defendant police officer's motion for summary judgment
> on qualified immunity grounds."  *Clem v. Corbeau*, 284 F.3d 543,
> 549 (4th Cir.2002).

*Miller v. Prince George's County*, ___ F.3d ___, ___, 2007 WL 137119, *3 (4th Cir. 2007).

Before reaching the first step of the qualified immunity analysis—*i.e.*, whether Coombe's

conduct violated Waybright's constitutional rights—this Court must resolve a threshold dispute

concerning the standard by which Coombe's conduct should be measured.

## III.    Standard for Measuring Conduct.

It is well-established that only governmental conduct that "shocks the conscience"

amounts to a violation of substantive due process under the Fourteenth Amendment.[7]  *County of*

---

[7]     Only one standard applies to alleged violations of substantive due process rights
under the Fourteenth Amendment and Article 24.  *See, e.g.*, *Pickett v. Sears, Roebuck & Co.*, 775
A.2d 1218, 1224 (Md. 2001) ("This Court has interpreted Article 24 of the Maryland Declaration

*Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  Inquiring whether governmental conduct shocks the conscience is a "threshold question" in cases "challenging executive action on substantive due process grounds. . . ."  *Lewis*, 523 U.S. at 847 n. 8.  This inquiry is critical because "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id*. at 846 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992)).  It also helps to distinguish conduct that violates substantive due process from conduct that is "otherwise clearly actionable" under "state tort laws."  *Temkin v. Frederick County Com'rs*, 945 F.2d 716, 720 (4th Cir. 1991); *see also Collins*, 503 U.S. at 128 (rejecting the claim that "the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law.") (citations omitted); *Pinder v. Johnson*, 54 F.3d 1169, 1178 (4th Cir. 1995) (declining to recognize a "broad" substantive due process claim "to affirmative protection from the state" because it "would be first step down the slippery slope of liability").

The Supreme Court has emphasized that whether conduct supports a Fourteenth Amendment claim depends on the circumstances of a particular case.

> [L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.  It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.  Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as

of Rights and the Due Process clause of the Fourteenth Amendment of the United States Constitution to be *in pari materia*, such that the interpretations of the Due Process clause of the Fourteenth Amendment provided by the United States Supreme Court serve as persuasive authority for Article 24.").

> recklessness or gross negligence, is a matter for closer calls.  To be
> sure, we have expressly recognized the possibility that some
> official acts in this range may be actionable under the Fourteenth
> Amendment and our cases have compelled recognition that such
> conduct is egregious enough to state a substantive due process
> claim in at least one instance.

*Lewis*, 523 U.S. at 849 (citations and quotation marks omitted).

In *Young v. City of Mt. Ranier*, 238 F.3d 567 (4th Cir. 2001), the Fourth Circuit echoed

the Supreme Court's analysis in *Lewis*.  After observing that "[d]epending on the circumstances,

different degrees of fault may rise to the level of conscience-shocking," *Young*, 238 F.3d at 574,

the Fourth Circuit identified the different levels of culpability associated with negligent,

deliberately indifferent, and intentional conduct:

- "[N]egligently inflicted harm" is never viewed as sufficiently shocking to
  the conscience that such conduct can support a Fourteenth Amendment
  claim.

- There are limited circumstances where conduct that is "deliberately
  indifferent"—*i.e.*, conduct that is "more than negligent but less than
  intentional"—is viewed as sufficiently shocking to the conscience that it
  can support a Fourteenth Amendment claim.

- Conduct "intended to injure" is most likely to rise to the conscience-
  shocking level for Fourteenth Amendment purposes.

*Id.* at 574 (citations omitted); *see also Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005)

("Mere negligence is never sufficient.  Proof of intent to harm is usually required, but in some

cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this

substantive due process threshold.") (citation omitted); *Lewis*, 523 U.S. at 847 ("While the

measure of what is conscience-shocking is no calibrated yard stick, it does . . . point the way.")

(internal quotations marks, alterations, and citation omitted);

In this case, Plaintiffs contend that Coombe's conduct should be measured by the

deliberate-indifference standard.  Plaintiffs support this contention by invoking three legal

theories.  First, Plaintiffs contend that the deliberate-indifference standard should be applied in light of the "special relationship" that existed between Waybright and the Department.  Second, Plaintiffs suggest that this standard is appropriate because of the "state created danger" to which Waybright was subjected.  Finally, Plaintiffs contend that the deliberate-indifference standard always applies when, as here, the government official involved had an opportunity to actually deliberate.  Each of these theories is addressed in further detail below.

### A.      "Special Relationship" Theory.

The "special relationship" theory is rooted in *DeShaney v. Winnebago County Dept. of Social Svcs.*, 489 U.S. 189 (1989).  In that case, the Supreme Court established the general rule that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id*. at 197.  The Supreme Court noted, however, that an affirmative duty to protect an individual from harm inflicted by third parties may arise in some circumstances:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976); *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982)).

The Fourth Circuit has emphasized that the *custodial* nature of a special relationship is what gives rise to the government's affirmative duty to protect:

> *DeShaney* reasoned that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200.  Some sort of confinement of the injured party—

> incarceration, institutionalization, or the like—is needed to trigger
> the affirmative duty.  *Id.*  This Court has consistently read
> *DeShaney* to require a custodial context before any affirmative
> duty can arise under the Due Process Clause.

*Pinder*, 54 F.3d at 1175 (citations omitted); *see also Walton v. Alexander*, 44 F.3d 1297, 1303

(5th Cir. 1995) ("[O]nly when the state, by its affirmative exercise of power, has custody over an

individual *involuntarily or against his will* does a special relationship exist between the

individual and the state.") (emphasis in original; quotation marks and citations omitted).  This

Court is compelled to note that the "special relationship" theory rooted in the *DeShaney* opinion

and its progeny has been applied almost exclusively in the area of police custody cases.  There is

no reasonable basis from which a finder of fact could conclude that Andrew Waybright was in a

custodial situation on the morning of July 3, 2002 when he was in the midst of firefighter recruit

training.

**B.    "State Created Danger" Theory.**

The "state created danger" theory is another exception to the general rule that a state is

not liable for the acts of third parties.  Under this theory, an affirmative duty to protect arises

when the state creates the danger or renders the individual more vulnerable to a danger created

by others.  *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers

that Joshua faced in the free world, it played no part in their creation, nor did it do anything to

render him any more vulnerable to them.").

The Fourth Circuit has discussed the state-created-danger theory on at least occasion:

> When the state itself creates the dangerous situation that resulted in
> a victim's injury, the absence of a custodial relationship may not be
> dispositive.  In such instances, the state is not merely accused of a
> failure to act; it becomes much more akin to an actor itself directly
> causing harm to the injured party.  At most, these cases stand for
> the proposition that state actors may not disclaim liability when
> they themselves throw others to the lions.  They do not, by

14

> contrast, entitle persons who rely on promises of aid to some
> greater degree of protection from lions at large.

*Pindar*, 54 F.3d at 1177 (citations omitted).  The Fourth Circuit did not apply the state-created-danger theory in *Pindar* because that case presented nothing more than a pure "omission claim" where the officer "'stood by and did nothing when suspicious circumstances dictated a more active role.'"  *Id.* at 1175-76 (quoting *DeShaney*, 489 U.S. at 203).  In a later unpublished decision, however, the Fourth Circuit recognized the validity of the state-created-danger approach.  *See Stevenson ex rel. Stevenson v. Martin County Bd. of Ed.*, 3 Fed. Appx. 25, 31-32, 2001 WL 98358, *5-7 (4th Cir. Feb. 6, 2001) (construing *DeShaney* as setting forth a state-created-danger exception to the general rule that a state is not liable for the acts of third parties).

### C.    "Opportunity to Deliberate" Theory.

The final theory advanced by Plaintiffs is that "the 'deliberate indifference' test is applied whenever deliberation is practical. . . ."  (Pl.'s Opp. Mots. Summ. J. p. 35.)  In making this argument, Plaintiffs rely on *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S.Ct. 2023 (2006).  In that case, the United States Court of Appeals for the Sixth Circuit suggested that the amount of time available for actual deliberation is a critical element in deciding whether to apply the intent-to-harm standard or the deliberate-indifference standard:

> In general, the level of culpability required to support section 1983
> liability depends upon the circumstances of each case. The
> determining factor is "whether the circumstances allowed the state
> actors time to fully consider the potential consequences of their
> conduct." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th
> Cir. 2002) (citation and internal quotation marks omitted).  The
> deliberate indifference standard normally applies in cases, like the
> present one, where a pretrial detainee is alleged to have been
> denied adequate medical care.  In contrast, the heightened standard

> requiring malice and intent to harm normally applies "when
> unforeseen circumstances demand an officer's instant judgment,"
> such as in a "high speed vehicle chase." *Ewolski*, 287 F.3d at 511
> (citation and internal quotation marks omitted).

*Owensby*, 414 F.3d at 602-03 (some citations omitted).  The Fourth Circuit does not appear to

have adopted the approach taken in the *Owensby* decision.

## IV.      The Violation of a Constitutional Right.

After carefully considering the matter, this Court finds that none of the legal theories

relied on by Plaintiffs apply in this case.  First, the evidence does not suggest that a "special

relationship" existed between Waybright and the Department.  Even if this Court assumes that

custody is not required for a special relationship to exist, there are no facts upon which a

reasonable fact finder could determine that Waybright's liberty was restricted in any fashion.

This Court rejects Plaintiffs' attempt to locate a deprivation of liberty in Coombe's decision to

conduct a training run on July 3, 2002.  (*See* Pl.'s Suppl. Resp. p. 5 ("Decedent's supervisor

ordered him to run in extreme conditions. . . .").)  That decision simply does not involve a

deprivation of liberty sufficient to establish a special relationship for substantive due process

purposes.  *See Pindar*, 54 F.3d at 1175 (noting that a special relationship exists outside the

custodial context where there is "[s]ome sort of confinement of the injured party," where

individuals are "affirmatively restrained," or where a person's liberty is "otherwise restricted")

(citation omitted).

As the United States Court of Appeals for the District of Columbia recently noted in

*Estate of Phillips v. District of Columbia*, 455 F.3d 397 (D.C. Cir. 2006), the "special

relationship" exception cannot be expanded into the public employment context.  *Id*. at 406 ("In

the public employment context, we have consistently rejected imposing a heightened employer-

to-employee obligation because of the absence of a state-imposed restraint on liberty.").  The

16

rights and obligations of public employment are necessarily established by the legislative bodies

which establish those public employment positions.  This Court cannot by constitutional

interpretation establish standards to be followed in public employment training exercises such as

the one which led to the tragic death of Andrew Waybright.

Second, Plaintiffs forecast no facts to support the application of the state-created-danger

theory.  That theory is typically invoked in non-custodial cases where a government official with

knowledge of the relevant risks *affirmatively forces* an individual into a dangerous situation.  For

example, in *Pulliam v. Ceresini*, 221 F. Supp. 2d 600 (D. Md. 2002), Judge Nickerson of this

Court applied the state-created-danger theory where a woman was assaulted after a police officer

brought her estranged husband to her home and ordered her to let him in.  In distinguishing cases

relied upon by the defendants, Judge Nickerson noted that:

> [T]he instant case involves affirmative conduct on the part Officer
> Ceresini (or another officer under his direction).  The officer
> injected Mr. Pulliam into Plaintiff's home, thus creating a danger
> where previously none existed.  According to the allegations in the
> Complaint, Mr. Pulliam would not have been in a position to
> assault Plaintiff if he had not been driven to her home by the
> officer and if the officer had not ordered Plaintiff to admit him,
> over her repeated and impassioned protestations.

*Id*. at 604-605.  In contrast, there is no suggestion in this case that Waybright was affirmatively

forced to participate in the training exercise that resulted in his untimely and tragic death.  There

is no suggestion, for example, that Coombe ordered Waybright to continue running after he

started to experience symptoms of heat exhaustion.  (*Cf*. Pl.'s Opp. Mots. Summ. J. p. 10 (Noting

that "after Andrew collapsed he . . . tried to crawl on his hands and knees in the direction of the

run route and kept saying: 'I want to finish with my class.'") (citation omitted).)

In addition, the Supreme Court has made clear that "the Due Process Clause does not

impose an independent federal obligation upon municipalities to provide certain minimal levels

of safety and security in the workplace. . . ."  *Collins*, 503 U.S. at 130.  It is impossible to square this holding with Plaintiffs' argument that "the fire department created the danger by establishing the completely unsafe training program [that] Andrew Waybright participated in." (Pl.'s Surreply p. 13.)  As the Supreme Court has explained:

> We also are not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.  Petitioner's claim is analogous to a fairly typical state-law tort claim: The city breached its duty of care to her husband by failing to provide a safe work environment.  Because the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law.  The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship.

*Collins*, 503 U.S. at 128 (citations and internal quotation marks omitted).  In sum, the Department was not constitutionally obliged by the Due Process Clause to protect Waybright from the risks associated with the training program.  As a result, there is no basis for applying the state-created-danger theory.

Third, this Court finds that the opportunity-to-deliberate theory also does not apply in the case at bar.  As a preliminary matter, this approach to culpability does not appear to have been applied by the Fourth Circuit.  More importantly, a thorough review of decisions invoking this theory strongly suggests that it only applies in the custodial or state-created-danger context.  *See Fraternal Order of Police v. Williams*, 375 F.3d 1141, 1146 (D.C. Cir. 2004) ("The opportunity for deliberation alone is not sufficient to apply the lower threshold to substantive due process claims.  Instead, it is '[b]ecause of . . . special circumstances' like custody that 'a State official's

deliberate indifference . . . can be truly shocking.'") (quoting *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001) (other citation and internal quotation marks omitted).[8] Accordingly, this Court rejects Plaintiffs argument that the deliberate-indifference standard applies in this case simply because Coombe was in a position to engage in actual deliberation.

This Court finds that the appropriate standard for measuring the conduct of Coombe is the higher intent-to-harm standard, not the lower deliberate-indifference standard. In other words, only if Plaintiffs can establish that Coombe intended to injure Waybright could the governmental conduct at issue be said to "shock the conscience." *Lewis*, 523 U.S. at 846. In this case, there is no genuine dispute that Coombe did not intend to injure Waybright. Regardless of the level of Coombe's alleged negligence, the evidence simply does not permit an inference of intent to harm. As a result, even after construing the evidence in the light most favorable to Plaintiffs, Coombe's conduct cannot "properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins*, 503 U.S. at 128. Accordingly, Defendant Coombe's Motion for Summary Judgment with respect to the federal and state constitutional claims in Counts 23-24 of the Second Amended Complaint is GRANTED.[9]

---

[8]      *See also Ewolski*, 287 F.3d at 511 n.5 ("[D]eliberate indifference applies in custodial settings because these settings provide the opportunity for reflection and unhurried judgments. Custodial settings, however, are not the only situations in which officials may have a reasonable opportunity to deliberate. 'Like prison officials who are charged with overseeing an inmate's welfare, State officials who create or enhance danger to citizens may also be in a position where 'actual deliberation is practical.'") (quoting *Butera*, 235 F.3d at 652) (other citations omitted).

[9]      Assuming *arguendo* that Officer Coombe's actions violated Waybright's substantive due process rights, this Court would consider the second step of the qualified immunity analysis, *i.e.*, were those rights "clearly established" at the time of the events at issue. *Saucier*, 533 U.S. at 201. The Fourth Circuit has remarked that "[t]he extensive debate provoked by this case should be proof enough that the law in this area was anything but clearly established at the time," *Pindar*, 54 F.3d at 1177, and this Court echoed that very sentiment at the February 17 hearing. There is simply no question that the rights at issue in this matter were not clearly

**V.      The Constitutional Claims Against the Other Defendants.**

Plaintiffs' assert causes of action for "supervisory liability" for substantive due process violations against Defendants Walter Murray, Stanley Poole, Mark McNeal, and Andrew Marsh, as supervisors at the Frederick County Department of Fire and Rescue Services, and against the Defendants David Gray, John L. Thompson, Jr., Richard Welden, Jan H. Gardner, and Terre R. Rhoderick, as members of the Board of Commissioners of Frederick County.  These claims are asserted under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights.

With respect to the allegation of a federal constitutional violation for supervisory liability, this Court has previously summarized the relevant standard:

> Section 1983 does not provide for *respondeat superior* liability; rather, liability is premised "on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  *Slakan v. Porter, et al.*, 737 F.2d 368, 372 (4th Cir. 1984); *see also Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999).  In order to establish such a claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'"  *Carter*, 164 F.3d at 221 (quoting *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994)).

*Turner v. Knight*, 192 F. Supp. 2d 391, 399 (D. Md. 2002).  In this case, Plaintiffs' claims for supervisory liability fail for at least three reasons.  First, as explained above, there is no basis for concluding that the subordinate—in this case, Coombe—committed a constitutional violation.  *See* Discussion *supra* § IV.

---

established as of July 3, 2002.  *See also Johnson v. Caudill*, ___ F.3d ___, ___, 2007 WL 291396, *4 (4th Cir. 2007) ("We do not require of such officials the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct.'") (quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996)).

Second, with respect to the first element—actual or constructive knowledge of a risk of constitutional injury—Plaintiffs fail to forecast sufficient evidence.  Plaintiffs focus on *general* problems at the management level but do not proffer evidence that would permit the more *specific* inference that the supervisors knew or should have known about the risk of constitutional injury.  For example, Plaintiffs note that Defendants should have been aware of "incidents prior to July 2002 where fire fighter recruits were injured at the FCDFRS training academy, separate and apart from the normal ankle sprains or cuts, and including dehydration, chest pains, and hypertension."  (Pl.'s Opp. Mots. Summ. J. p. 55 (citation omitted).)  Plaintiffs also point out that "[e]ach of the supervisory Defendants knew, evidenced by their sworn testimony, that the staffing of instructors was clearly inadequate and, therefore, presented a serious safety risk."  (*Id*. at p. 56.)  Although such evidence might permit a reasonable juror to conclude that there were problems at the management level, it simply would not support the inference that Coombe's supervisors possessed actual or constructive knowledge of  "conduct that posed 'a pervasive and unreasonable risk' of constitutional injury."  *Shaw*, 13 F.3d at 799 (citation omitted).

Finally, Plaintiffs fail to make the requisite showing in connection with the second element of the test for supervisory liability, *i.e.*, deliberate indifference to constitutional risk.  As a preliminary matter, this Court has already explained that the deliberate-indifference standard does not apply in this particular context.  *See* Discussion *supra* § IV.  In addition, Plaintiffs fail to forecast any evidence showing that the conduct posing a risk of constitutional injury is widespread.  Plaintiffs tacitly acknowledge this point in a later paper by arguing that a showing of widespread conduct is not necessary where actual or constructive knowledge of an unreasonable risk of constitutional injury is demonstrated.  (*See* Pl.'s Surreply p. 22.)  As already

21

noted, however, the evidence proffered by Plaintiffs fails to demonstrate such knowledge. *See Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) ("Ordinarily, [a plaintiff] cannot satisfy his burden of proof [on the second element] by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.").

In sum, Plaintiffs fail to establish at least two of the elements needed to proceed with a claim for supervisory liability. Accordingly, Defendants' Motion for Summary Judgment with respect to the federal and state constitutional claims in Counts 25-32, 35-44, and 47 of the Second Amended Complaint is GRANTED.[10]

## VI.  The State Law Tort Claims.

Defendants also seek summary judgment with respect to Plaintiffs' state causes of action for survival, wrongful death, and loss of solatium. After carefully considering the matter, however, this Court declines to exercise supplemental jurisdiction over those residual state law claims. *See* 28 U.S.C. § 1367(a); *see also Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (noting that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."). This Court has exercised its supplemental jurisdiction over Plaintiffs' state constitutional claims as only one standard applies to both the federal and state constitutional claims alleging violations of substantive due process

---

[10]      This Court has previously noted that the Maryland Court of Appeals has held that the protections of the federal and state constitutions are similar, but that there are "different rules" with respect to *respondeat superior* liability. *Pullium*, 221 F. Supp. 2d at 606 (quoting *DePino v. Davis*, 729 A.2d 354, 371 (1999)). As this Court has determined that Plaintiffs' allegations do not give rise to substantive due process violations, there is no *respondeat superior* liability with respect to the state constitutional claims. For the same reason, this Court need not address whether Coombe's conduct in this case arose from a policy or custom within the ambit of *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) so as to support the federal constitutional claim against Frederick County.

rights. *See* Discussion *supra* § III at n.7.

The remaining state law claims involve novel and complex arguments regarding the interplay between the Maryland Workers' Compensation Act, Md. Code Ann., Lab. & Empl. §§ 9-101-1204, the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 5-301-304, and the Maryland Wrongful Death Act, Md. Code Ann., Cts. & Jud. Proc. §§ 3-901-904.  In addition, Judge Julie R. Stevenson Solt of the Circuit Court for Frederick County, Maryland, has already made certain rulings with respect to these claims.  *See* Background *supra*. Based on the record presently before this Court, moreover, it is difficult to determine the precise impact of those rulings.  Therefore, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law tort claims pursuant to 28 U.S.C. § 1367(c).  Accordingly, the state law tort claims set forth in Counts 1-15 of the Second Amended Complaint are REMANDED to the Circuit Court for Frederick County.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' Motions for Summary Judgment are GRANTED-IN-PART and DENIED-IN-PART.  Judgment will be entered in favor of Defendants and against Plaintiffs with respect to the Plaintiffs' federal and state constitutional claims under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights.  Plaintiffs' residual claims based on Maryland tort law, however, will be REMANDED to the Circuit Court for Frederick County, Maryland.  A separate Order follows.


Dated: March 1, 2007                                    /s/_____
                                                                      Richard D. Bennett
                                                                      United States District Judge